OPINION {¶ 1} Atlee Arick appeals the April 21, 2006 judgment entry of the Franklin County Court of Common Pleas granting summary judgment in favor of appellee, Seagle Masonry, Inc., on Arick's intentional tort claim.
 {¶ 2} The pleadings, affidavits and deposition testimony proffered by the parties on summary judgment set forth the following facts. Appellee is a masonry company owned and operated by Timothy, Tracy and Donny Seagle. Timothy and Tracy have been working in the masonry business since 1984, and Donny started in 1987. At the time of the accident, appellee's business consisted mainly of constructing concrete block walls for basements in residential homes. The masons could do a majority of the wall construction without vertical aid. However, as the walls grew to chest level, scaffolding was necessary. The Seagles have always created scaffolding in the same manner and believe 99 percent of masonry builders industry wide use the same method. Moreover, the Seagles stated that, during all of their collective years in the business, they had never seen or heard of scaffolding built in such a manner tipping over or collapsing. None of appellee's workers ever reported to them that a scaffold had tipped or collapsed.
 {¶ 3} Known in the industry as a "hop board," the scaffolding is constructed using OSHA approved board and industry-standard concrete blocks. The boards measure ten inches wide by eight feet long and are two inches thick. The blocks are 16 inches long, eight inches high and eight inches wide. Piers of concrete blocks form the base of the scaffolding. The first block is placed on the ground about eight inches away from and parallel to the wall. Additional blocks are then stacked to create a column. Each additional block is placed perpendicular to and abutting the wall to give support and stability to the column. Boards are placed on top of the completed piers, a few inches away from the surface of the wall. The scaffolding's piers are no more than six blocks high. The scaffolding is placed around the inside perimeter of the wall and is connected by overlapping the boards on top of the piers.
 {¶ 4} All workers at the site use the scaffolding to enter and exit the basement under construction. The workers walk across a board suspended between the ground and the partially constructed wall. From that board, the worker would step down onto the scaffolding. Blocks were placed in a stair-like configuration to allow movement between the basement subfloor and the top of the scaffolding.
 {¶ 5} Appellant began working for appellee in August 2003. His work with the company included loading and unloading trucks, stacking block for the masons' use, carrying hod (mortar), and building scaffolding. Appellant stated that on previous occasions, after nights of hard rain, "the scaffolding would be tipped over by itself just where the blocks had settled in the mud." (Appellant's brief, at 4.) Additionally, appellant said that, on five or six occasions, he had seen workers jumping off scaffolds that were beginning to tip, but no one had ever been hurt.
 {¶ 6} Appellant's accident occurred on November 4, 2003, which was appellant's first day at that particular basement. It had rained the previous night, but there was no rain in the morning or during the workday. Appellant arrived at the site and worked for four hours before lunchtime. He stated that the scaffolding was built during the morning while he was working. After lunch, appellant returned to the basement site. He walked across a pile of dirt that had been removed from the basement and across a board that goes over the constructed wall into the excavated space. From there, appellant stepped onto a board comprising the top of the scaffolding to descend into the basement.[1] As he did so, he felt "it" tip over and fell backwards, injuring his knee when he tried to catch himself.[2] Appellant stated that, in all, four boards and five pillars fell, though none of the debris landed on him or caused injury.
 {¶ 7} On April 1, 2005, appellant filed suit against appellee alleging that the accident was the result of an intentional tort and seeking compensation for the injury to his knee. On March 10, 2006, appellee filed a motion for summary judgment with supporting affidavits and deposition testimony. Appellant responded with a similarly supported memorandum opposing summary judgment. On April 21, 2006, the trial court granted appellee's motion for summary judgment. This appeal followed. Appellant raises a single assignment of error:
 THE TRIAL COURT ERRED IN GRANTING DEFENDANT-APPELLEE SEAGLE MASONRY INC.'S MOTION FOR SUMMARY JUDGMENT.
Appellee asserts an assignment of error on cross-appeal:
 The trial court erred in finding that Plaintiff-Appellant has met the first prong of the Fyffe v. Jeno's test.
 {¶ 8} Appellate review of a trial court's decision on summary judgment is de novo. Doe v. Shaffer (2000), 90 Ohio St.3d 388, 390. We must independently review the record to determine whether summary judgment was appropriate. Mergenthal v. Star Banc Corp. (1997),122 Ohio App.3d 100, 103. Pursuant to Civ.R. 56, summary judgment is properly granted only when the record, viewed in a light most favorable to the nonmoving party, demonstrates that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Civ.R. 56(C); Temple v. Wean United, Inc. (1977), 50 Ohio St.2d 317, 327.
 {¶ 9} The party moving for summary judgment bears the burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact regarding the essential elements of the claims presented. Dresher v. Burt (1996), 75 Ohio St.3d 280, 292-293. Once that burden is satisfied, the nonmoving party cannot prevent summary judgment with unsubstantiated allegations or conclusions. Instead, the nonmoving party must demonstrate the continued existence of a genuine issue of material fact by directing the court's attention to relevant, affirmative evidence of the type listed in Civ.R. 56(C). Id., citing Civ.R. 56(E).
 {¶ 10} Generally, Ohio's workers' compensation statutes bar an injured worker from suing his employer for injuries suffered during industrial accidents. R.C. 4123.74. However, the immunity granted to participating employers by workers' compensation laws does not apply in the event that the employer's conduct is so egregious as to amount to an intentional tort. See Sanek v. Duracote Corp. (1989), 43 Ohio St.3d 169;Blankenship v. Cincinnati Milacron Chemicals, Inc. (1982),69 Ohio St.2d 608. In light of the broad scope of the workers' compensation system, intentional torts in the workplace are narrowly defined.
 {¶ 11} In Fyffe v. Jeno's Inc. (1991), 59 Ohio St.3d 115, the Supreme Court of Ohio set forth the following three-part test for use in determining whether an employer has committed an intentional tort:
 Within the purview of Section 8(A) of the Restatement of the Law 2d, Torts, and Section 8 of Prosser Keeton on Torts (5 Ed.1984), in order to establish "intent" for the purpose of proving the existence of an intentional tort committed by an employer against his employee, the following must be demonstrated: (1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task. (Van Fossen v. Babcock Wilcox Co. [1988], 36 Ohio St.3d 100, 522 N.E.2d 489, paragraph five of the syllabus, modified as set forth above and explained.)
Id. at paragraph one of the syllabus. A plaintiff claiming an intentional tort must establish each of the three elements of theFyffe test. It is not enough to prove that the employer acted negligently or recklessly. Id., paragraph two of the syllabus. Only where "the employer knows that injuries to employees are certain or substantially certain to result" from a known dangerous process or condition, and the employer requires the employee to perform the dangerous task, will that employer be deemed to have intended the resulting injury. Id.
 {¶ 12} The key to determining whether the employer acted with the requisite intent "rests upon the employer's actual knowledge of, and its response to, the dangerous situation." Youngbird v. Whirlpool Corp.
(1994), 99 Ohio App.3d 740, 744. "The focus of an intentional tort action * * * is on the knowledge of the employer regarding the risk of injury. The plaintiff has the burden of proving by a preponderance of the evidence that the employer had `actual knowledge of the exact dangers which ultimately caused' injury." Sanek, at 172, quoting VanFossen v. Babcock Wilcox Co. (1988), 36 Ohio St.3d 100, 112.
 {¶ 13} Here, the trial court found that appellant met the first prong of the Fyffe test, but failed to satisfy the second prong: knowledge that harm to the employee is substantially certain if the employee is subjected to a dangerous process or condition. Appellant's assignment of error challenges that conclusion.
 {¶ 14} Appellee's cross-assignment of error disputes the trial court's conclusion that appellant presented evidence creating a genuine issue of material fact regarding the first prong of the Fyffe test. Appellee submits that appellant failed to demonstrate that scaffolding amounted to a dangerous process or that appellee knew the scaffolding was dangerous. Because our resolution of appellee's cross-assignment of error is dispositive of this appeal, we address the cross-appeal first.
 {¶ 15} In order to satisfy the first prong of the Fyffe test, appellant was required to prove that appellee knew "of the existence of a dangerous process, procedure, instrumentality or condition within its business operation." To do so, appellant must demonstrate that: (1) there was a dangerous condition, and (2) appellee had knowledge that said dangerous condition existed. Moreover, "the `dangerous condition' at issue must be one which falls outside the `natural hazards of employment.'" Youngbird, at 747, quoting Brady v. Safety-KleenCorp. (1991), 61 Ohio St.3d 624, 631.
 {¶ 16} The affidavits and deposition testimony proffered by the parties on summary judgment do not support the conclusion that appellee had actual knowledge that the scaffolding constituted a dangerous condition. The Seagles collectively testified that they had constructed the scaffolding in the same manner for their entire careers and believed that a majority of other masons use the same methods for similar projects. The scaffolding had never posed a problem, and no one had reported any concerns regarding the scaffolding's stability or safety. Furthermore, while appellant stated that he had seen other workers jump from tipping scaffolding, there is no evidence that he-or any other workers-brought those problems to appellee's attention.
 {¶ 17} Appellant asserts that the testimony elicited from Gary N. Curren, who provides safety consulting for general industry and construction, conclusively demonstrates that the scaffolding was dangerous. In his affidavit, Curren stated:
 The scaffolding as put together was obviously dangerous as it was unstable and it was inevitable that someone would fall due to the instability. Seagle Masonry knew of the existence of the dangerous process, procedure, instrumentality, or condition within its business operation.
(Curren affidavit, ¶ 6.) Though Curren concluded that the scaffolding "was obviously dangerous," he failed to explain why or how the scaffolding was dangerous. Moreover, while his affidavit indicates that he reviewed the affidavits submitted by the Seagles, he does not indicate where, when or in what way the Seagles admitted any knowledge of danger. Contrary to Curren's statement, the Seagles wholly disclaimed that any danger was associated with the manner in which the scaffolding was constructed. Curren's unfounded legal conclusions do not create a genuine issue of material fact regarding the innate level of safety of the scaffolding. See Hackathorn v. Preisse (1995), 104 Ohio App.3d 768,772 ("[s]uch legal conclusions [rather than factual statements] should not have been included in the affidavits and, in any event, did not create any issues of fact").
 {¶ 18} Alternately, appellant contends that appellee was aware that the scaffolding, even if not inherently dangerous, could become unsafe under certain circumstances. Donny Seagle explained that if the blocks were misaligned or if the scaffolding was constructed over a poor subsurface, the scaffolding could become unsafe. However, acknowledgment of the possibility of danger given specific situations does not prove intent where there is no evidence that those circumstances exist, or, if they exist, that the employer had knowledge thereof.
 {¶ 19} Appellant failed to produce evidence demonstrating that the scaffolding was either poorly constructed or constructed on an unstable subsurface. At most, appellant asserted that it had rained heavily the previous night, which made the basement floor muddy. Although appellant claimed that he had seen scaffolding tip over when the blocks settled into mud in the past, he did not testify that the scaffolding appeared lopsided or unsteady when he arrived at work that day. In fact, the block scaffolding was newly constructed that morning. Appellant presented no evidence that mud had compromised the integrity of the scaffolding. To the contrary, he testified that the scaffolding did not appear or act wobbly during the morning hours. Additionally, the crew had worked for four hours that morning without experiencing any problems.
 {¶ 20} Most significant is the complete dearth of evidence that appellee had any knowledge that the scaffolding, newly raised that morning, was constructed in an unsafe manner. The employer's knowledge of a dangerous condition is the sine qua non of the first prong ofFyffe. In his affidavit, Tracy Seagle testified that the company had worked on the basement for four hours before lunch, during which time "no one reported any problems with the platforms, and none of the platforms fell over or collapsed. I was not aware that any platform had been built in an unsafe or risky manner." (Tracy affidavit, ¶ 14.) Appellant did not produce any evidence to contradict appellee's lack of knowledge that the scaffoldings, or the manner in which the scaffoldings were constructed, presented a dangerous condition. Without employer knowledge, there can be no intentional tort.
 {¶ 21} Because there is no evidence that appellee had actual knowledge of a dangerous process or condition, the first prong of theFyffe test was not met. Accordingly, appellee's cross-assignment of error is sustained.
 {¶ 22} Because appellant failed to meet the first prong of theFyffe test, we need not determine whether appellant satisfied the remaining factors. See Youngbird, at 744. ("[E]ven if the plaintiff's injury was substantially certain to occur, that issue is moot if no reasonable trier of fact could find from the evidence presented that the employer had knowledge of such risk"). Id. Accordingly, appellant's assignment of error is overruled as moot.
 {¶ 23} The judgment of the Franklin County Court of Common Pleas, which granted summary judgment to appellees, is affirmed, albeit on different grounds.
Judgment affirmed.
[1] The vertical distance between the two boards was about two blocks high, or 16 inches.
[2] Whether just the board or the entire scaffolding tipped over cannot be ascertained from the record.